1  KINGSLEY & KINGSLEY, APC
   Eric B. Kingsley, Esq. SBN- 185123
2  Email:  eric@kingsleykingsley.com
   Liane Katzenstein Ly, Esq., SBN-259230
3  Email:  liane@kingsleykingsley.com
   David Samuel  Winston, Esq., SBN-301667
4  Email: david@kingsleykingsley.com
   16133 Ventura Blvd., Suite1200
5  Encino, CA 91436
   Telephone: (818) 990-8300; Facsimile: (818) 990-2903
6
   MARTÍNEZ AGUILASOCHO & LYNCH, APLC
7  Mario Martínez, Esq. (SBN 200721)
   Email: mmartinez@farmworkerlaw.com
8  Thomas P. Lynch (SBN 159277)
   Email: tlynch@farmworkerlaw.com
9  Edgar L. Aguilasocho, Esq. (SBN 285567)
   Email: eaguilasocho@farmworkerlaw.com
10 P.O. BOX 11208
   Bakersfield, CA 93389-1208
11 TEL: (661) 859-1174; FAX (661) 840-6154
12
   Attorneys for Plaintiffs and the Proposed Class
13
                    UNITED STATES DISTRICT COURT
14
                    EASTERN DISTRICT OF CALIFORNIA
15

16 | RAFAEL MARQUEZ AMARO, JESUS | Case No.: 1:14-cv-00147-DAD-SAB
17 | ALARCON URZUA, ON BEHALF OF |
   | THEMSELVES AND OTHERS SIMILARLY | [Assigned for All Purposes to Hon. Stanley A.
18 | SITUATED, | Boone, Dept. 9]
19 |                    PLAINTIFFS, | **NOTICE OF MOTION AND MOTION FOR
   | | CLASS CERTIFICATION; MEMORANDUM
20 |         V. | OF POINTS AND AUTHORITIES IN
   | | SUPPORT THEREOF**
21 | GERAWAN FARMING, INC., A |
22 | CALIFORNIA CORPORATION; GERAWAN | [Filed concurrently with Declaration of Eric B.
   | FARMING PARTNERS, INC., A | Kingsley; Appendix of Exhibits; [Proposed]
23 | CALIFORNIA CORPORATION; DOES 1 - 10, | Order]
24 | INCLUSIVE, |
   | | Date:    January 13, 2016
25 |         DEFENDANTS. | Time:   10:00 a.m.
   | | Dept.:   9
26 | |
27 | | Complaint Filed:  February 3, 2014
   | | Trial Date:     None Set
28 | |

---

Plaintiff's Notice Of Motion And Motion For Class Certification

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

YOU ARE HEREBY NOTIFIED that on January 13, 2016 at 10:00 a.m. in Department 9 of the above entitled Court located at 2500 Tulare Street, Courtroom #9, 6th Floor, Fresno, California 93721, Plaintiffs RAFAEL MARQUEZ AMARO, JESUS ALARCON URZUA will and hereby do move this Court, pursuant to Federal Rule of Civil Procedure 23, for an order certifying this matter as a class action and that they be determined to be suitable class representatives.

Plaintiffs seek certification of the following proposed subclasses:

1.   Piece-Rate Subclass: All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, who were paid a piece-rate from February 3, 2010 up to the present.

2.   Minimum Wage Subclass All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, from February 3, 2010 to the present, whose compensation for any shift totaled less than the minimum wage.

3.   Former Employee Subclass: All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, from February 3, 2010 to the present, who were laid off at the end of a season.

This Motion is based on the following grounds: (1) the class is so numerous that joinder of all members if impracticable; (2) there are questions of law and fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Additionally, the Motion is based on the grounds that Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole and questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

This Motion is made based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Appendix of Exhibits, the Declaration of Eric B. Kingsley, the

2

Declaration of Mario Martinez, the Declarations Of Rafael Marque Amaro and Jesus Alarco Urzua,  the

Declaration of  Jeffrey S. Petersen, Ph.D., declarations of putative class members, deposition transcripts,

Defendant's corporate records, and the complete files and records in this Action, and such further

evidence and argument as may be heard at the time of the hearing.


DATED: December 11, 2015                    KINGSLEY & KINGSLEY, APC


                                           By: /S/ ERIC B. KINGSLEY_____
                                               ERIC B. KINGSLEY
                                               Attorney for Plaintiff

Plaintiff's Notice Of Motion And Motion For Class Certification

                                                    Case No. 1:14-cv-00147-DAD-SAB

# TABLE OF CONTENTS

<u>Page</u>

I.     **INTRODUCTION** ...................................................................................... 1

II.    **STATEMENT OF THE CASE** .............................................................. 2

     A.    Procedural History ........................................................................... 2

     B.    Summary of Relevant Facts ............................................................. 3

         1.    Gerawan, the Workforce & the Production of Grapes and Other Fruit ................. 3

         2.    Pre-Harvest ........................................................................... 4

         3.    The Harvest ........................................................................... 5

         4.    Gerawan's Record Keeping and Pay Policies ........................ 6

         5.    Gerawan's Rest Period Policy ............................................... 8

         6.    Gerawan's Employee Declarations Prove Field Workers Receive Rest Periods While Performing Piece Rate Work. ................. 9

         7.    Gerawan Provided Plaintiffs with Time and Pay Records for a Random Sample of 300 Field Workers and Class Counsel Retained an Expert to Analyze This Sample ................. 9

III.    **LEGAL STANDARDS GOVERNING CLASS CERTIFICATION** ................. 10

IV.    **THE REQUIREMENTS OF RULE 23(A) ARE SATISFIED** ................. 12

     A.    The Proposed Subclasses Are So Numerous As To Make Joinder Impracticable ........... 12

     B.    Common Questions of Law and Fact Predominate ........................ 14

         1.    Legal Framework Piece-Rate Pay and Commonality of Piece-Rate Sub-Class .... 15

         2.    Legal Framework for Minimum Wage and Commonality of Minimum Wage Subclass ................. 17

         3.    Framework for the Payment of Waiting Time Penalties and Commonality of Former Employee Subclass ................. 19

     C.    Plaintiffs' Claims Are Typical of the Class ........................ 20

     D.    Plaintiffs and Class Counsel Will Adequately Represent the Class ................. 20

V.     **THE REQUIREMENTS OF RULE 23(B)(2) AND (B)(3)  ARE SATISFIED** ......... 21

     A.    Plaintiffs Meet the Requirements of Rule 23(b)(2) ........................ 22

     B.    Plaintiffs Meet the Requirements of Rule 23(b)(3) ........................ 23

         1.    Common Questions Predominate Over Individual Questions ................. 23

i

       2.     Class Treatment is Superior to Other Available Methods ......................................24

VI.    **CONCLUSION** ............................................................................................................25

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

# TABLE OF AUTHORITIES

<strong><u>Page(s)</u></strong>

<u>**Federal Cases**</u>

*Aguirre v. Bustos,*
   89 F.R.D 645 (Dist. N.M 1981)...................................................................................13, 16

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997) .............................................................................................................23

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ..............................................................................................11

*Arnold v. United Artists Theatre Circuit,*
   158 F.R.D. 439 (1994)..........................................................................................................20

*Arredondo v. Delano Farms Co. et al.,*
   Case No. 1:09-cv-01247 (E.D. Cal. 2011) .....................................................................11, 15

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) .........................................................................................11, 25

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*
   917 F.2d 1171 (9th Cir. 1990)..............................................................................................20

*California Rural Legal Assistance, Inc. v. Legal Services Corp.,*
   917 F.2d 1171 (9th Cir. 1990).........................................................................................14

*Cardenas v. McLane FoodServices, Inc.,*
   796 F. Supp. 2d 1246 (C.D. Cal. 2011) ..............................................................................18

*Cartwright v. Viking Industries,*
   2009 U.S. Dist. LEXIS 83286 (E.D. Cal. 2009).................................................................12

*Cervantez v. Celestica Corp.,*
   253 F.R.D. 562 (C.D.Cal. 2008) .........................................................................................12

*Cruz v. Dollar Tree Stores, Inc.,*
   No. 07-2050 SC, 2009 WL 1458032 (N.D. Cal. May 26, 2009) ........................................12

*Dilts v. Penske Logistics, LLC*
   267 F.R.D. 625 (S.D.Cal. 2010) .........................................................................................12

*Doe v. D.M. Camp & Sons,*
   No. CIV-F051417AWISMS, 2009 WL 921442 (E.D. Cal. Mar. 31, 2009) ......................19

*Dukes v. Wal-Mart,*
   509 F.3d 1168 (9th Cir. 2007) ........................................................................12, 13, 15, 23

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,*
   657 F.2d 890 (7th Cir. 1981)........................................................................................11

*Eisen v. Carlisle and Jacquelin,*

iii

417 U.S. 156 (1974) ........................................................................................................... 11

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985) .................................................................................. 10, 11, 12

*Ellis v. Costco Wholesale Corp.*,
240 F.R.D. 627 (N.D. Cal. 2007) ........................................................................................ 22

*Evans v. IAC/Interactive Corp.*,
244 F.R.D. 568 (C.D. Cal. 2007) ........................................................................................ 12

*Gardner v. Shell Oil Co.*,
No. C09-05876 CW, 2011 WL 1522377 (N.D. Cal. Apr. 21, 2011) ................................ 22

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981) ............................................................................................................. 10

*Gutierrez v. Kovacevich "5" Farms*,
2004 U.S. Dist. LEXIS 29476 (E.D. Cal. 2004) ................................................................ 11

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .................................................................................... passim

*Harris v. Palm Springs Alpine Estates, Inc.*,
329 F.2d 909 (9th Cir.1964) ............................................................................................... 12

*Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*,
306 F.3d 842 (9th Cir.2002) ............................................................................................... 13

*Jordan v. County of Los Angeles*,
669 F.2d 1311 (9th Cir.1982) ............................................................................................. 13

*Kamar v. Radio Shack Corp*,
254 F.R.D. 387 (C.D. Cal. 2008) .......................................................................... 20, 23, 24

*Krzesniak v. Cendant Corp.*,
No. C 05-05156 MEJ, 2007 WL 1795703 (N.D. Cal. June 20, 2007) ............................. 12

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ....................................................................................... 21, 25

*Leyva v. Buley*,
125 F.R.D. 512 (E.D. Wash. 1989) ......................................................................... 15, 24, 25

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1162 ...................................................................................................................... 23

*Lockwood Motors v. General Motors Corp.*,
162 F.R.D 569 (D.C. MINN. 1995) ................................................................................... 25

*Martinez v. Mecca Farms, Inc.*
213 F.R.D. 601 (S.D. Fla. 2002) ......................................................................................... 15

*Montelongo, v. Meese*,
803 F.2d 1341 (5th Cir. 1986) ............................................................................................ 15

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

*Moore v. Hughes Helicopters, Inc.*,
  708 F.2d 475 (9th Cir.1983) .............................................................................................11

*Munoz v. Giumarra Vineyards Corp.*,
  No. 1:09-CV-00703-AWI, 2012 WL 2617553 (E.D. Cal. July 5, 2012) ...........................11

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
  116 F.R.D. 384 (E.D. Cal. 1986) ......................................................................................11

*Ontiveros v. Zamora*,
  2009 WL 425962 (E.D.Cal., 2009) ...................................................................................16

*Ortega v. J.B. Hunt Transport, Inc.*,
  258 F.R.D. 361 (C.D.Cal. 2009) ........................................................................................12

*Parra v. Bashas', Inc.*,
  536 F.3d 975 (9th Cir. 2008) .............................................................................................14

*Rodriguez v. Berrybrook Farms, Inc.*,
  672 F. Supp. 1009 (W.D. Mich. 1987) .............................................................................12

*Rodriguez v. Carlson*,
  166 F.R.D. 465 (E.D. Wash. 1996) ........................................................................13, 16, 25

*Smith v. B & O Railroad Co.*,
  473 F.Supp. 572 (D. Md. 1979) ........................................................................................13

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ..........................................................11, 14

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union,*
  *AFL-CIO, CLC v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010) .............................................................................................11

*Valenzuela v. Giumarra Vineyards Corp.*,
  614 F.Supp.2d (E.D.Cal. Feb. 20, 2009).  ...............................................2, 15, 16, 20

*Wang v. Chinese Daily News, Inc.*,
  623 F.3d 743 (9th Cir.2010) ..............................................................................................22

*Wasserstrom v. Eisenberg*,
  474 U.S. 946 (1985) ..........................................................................................................10

*Whiteway v. FedEx Kinko's Office & Print Servs.*
  2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ..........................................................11, 12, 13

*Yokoyama v. Midland Nat. Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010). .........................................................................................24

*Zinser v. Accufix Research Inst. Inc.*,
  253 F.3d 118 (9th Cir. 2001) ............................................................................................24

**State Cases**

*Armenta v. Osmose, Inc.*
  135 Cal.App.4th 314 (2005) ..............................................................1, 15, 17, 18, 19

v

*Barnhill v. Robert Saunders & Co.*
(1981) 125 Cal.App.3d 1 ................................................................................................19

*Bell v. Farmers Ins. Exch.,*
115 Cal.App.4th 715 (2004)...........................................................................................25

*Bluford v. Safeway Stores, Inc.,*
216 Cal. App. 4th 864 (2013),.....................................................................1, 15, 17, 18

*Gonzalez v. Downtown LA Motors, LP*
(2013) 215 Cal.App.4th 36 .............................................................................16, 18, 19

*Mamika v. Barca,*
(1998) 68 Cal.App.4th 487 ............................................................................................19

*Sav-on Drug Stores, Inc. v. Superior Court,*
34 Cal. 4th 319 (Cal. 2004) ...........................................................................................10

*Smith v. Superior Court,*
39 Cal. 4th 77 (Cal. Sup. Ct. 2006) ..........................................................................2, 19

**Federal Statutes**

Fed. Rule Civ. Proc.  23........................................................................................12, 14, 21, 22

Fed. Rule Civ. Proc. 23(a) ..............................................................................12, 14, 20, 21, 22

Fed. Rule Civ. Proc. 23(b) .............................................................................................passim

Migrant and Seasonal Agricultural Worker Protection Act .......................................1, 2, 15

**State Statutes**

Cal. Code Reg., Title 8, § 11000 ..................................................................................15

Cal. Code Reg., Title 8 § 11140 ...................................................................................15

Cal. IWC Wage Order No. 14-2001 ...............................................................................2

Cal. Lab. Code § 203 .................................................................................................3, 20

Cal. Lab. Code § 226.7 .............................................................................................2, 16

## I.  INTRODUCTION

Defendants Gerawan Farming, Inc. and Gerawan Farming Partners, Inc. ("Gerawan" or "Defendants") specialize in the cultivation, harvesting, and processing of grapes and other fruit.[1] Each year, Defendants hire thousands of seasonal agricultural workers to perform tasks in preparation of the harvest and during the harvest season.  Throughout the harvest, Defendants assign crews of field workers to pick and package grapes.[2] Defendants also utilize a uniform piece-rate compensation policy to compensate the field workers for each tub of grapes picked and for packaging the grapes.[3] At the conclusion of each harvest season, Defendants lay-off the field workers.[4]

Plaintiffs Rafael Marquez Amaro and Jesus Alarcon Urzua ("Plaintiffs") filed a class action lawsuit against Gerawan alleging that it violated California and Federal law by failing to pay field workers for all hours worked and minimum wages/overtime,  failing to compensate field workers for rest breaks, failing to pay waiting time penalties, and for violations of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA").

It is undisputed that Defendants provided field workers with rest periods as required by Labor Code § 226.7 and IWC Wage Order No. 14-2001.  Rather, Plaintiffs allege that Defendants failed to separately compensate field workers for rest periods when utilizing its piece-rate system as required under California law.[5] *See Bluford v. Safeway Stores, Inc.*, 216 Cal. App. 4th 864, 872 (2013), *reh'g denied* (June 18, 2013), *review denied (*Aug. 28, 2013) ("rest periods must be separately compensated in a piece-rate system. Rest periods are considered hours worked and must be compensated.") (*citing Armenta v. Osmose, Inc.* 135 Cal.App.4th 314, 323 (2005)).

Plaintiffs also allege that Defendants failed to pay all wages to field workers, because Defendants calculate the amount of minimum wages owed on a weekly, rather than a daily basis.[6] As a result, Defendants failed to pay field workers minimum wages when their aggregate wages for the week

1 (Kingsley Decl., ¶ 16, Appendix, Exh.18); (Erevia depo., 24:24-25:8)
2 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., Exh. 9 at Bates Stamp 142).
3 (Kingsley Decl., ¶ 16, 17, 29, and 32 Appendix, Exh. 18, 19, 24, and 27); (Erevia depo., 29:25-30:15); (Noland depo., Exh. 1, Bates Stamp 668); (Erevia depo., Exh. 9 at Bates Stamp 142).
4 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 24:11-17).
5 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 97:19-99:11).
6 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 60:5-19).

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

exceeded the minimum wage threshold, but their daily wages fell below the minimum amount.[7] Finally, Plaintiffs allege that as a derivative claim, Defendants failed to pay Plaintiffs and the other field workers all wages due at the time they separated from the company pursuant to Labor Code § 203. These waiting time penalties are available each time that a field worker was laid off for the season. *Valenzuela v. Giumarra Vineyards Corp.*, 614 F.Supp.2d 1089, 1101-1103 (E.D.Cal. Feb. 20, 2009). ("Plaintiff's allegations of discharge from seasonal agricultural work states a claim under California's waiting time penalty laws."), *citing Smith v. Superior Court*, 39 Cal. 4th 77, 93-4 (Cal. Sup. Ct. 2006).

All of these claims stem from Defendants' uniform wage and hour policies and practices. Accordingly, Plaintiffs seek to certify the following discrete subclasses, defined as:

> 4.   Piece-Rate Subclass: All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, who were paid a piece-rate from February 3, 2010 up to the present.

> 5.   Minimum Wage Subclass All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, from February 3, 2010 to the present, whose compensation for any shift totaled less than the minimum wage.

> 6.   Former Employee Subclass: All individuals who have been employed, or are currently employed, by Defendant Gerawan as a non-exempt, hourly "field worker" or similar titles, from February 3, 2010 to the present, who were laid off at the end of a season.

Certification of the subclasses is appropriate as all of the requirements for certification, pursuant to FRCP 23, are satisfied. As such, Plaintiffs respectfully requests that this Court certify the subclasses.[8]

## II.   STATEMENT OF THE CASE

### A.   Procedural History

On February 3, 2014, Plaintiffs filed a Class Action Complaint against Defendants alleging six causes of action: (1) AWPA; (2) Failure to Pay Minimum Wages; (3) Failure to Pay Wages and Overtime; (4) Failure to Compensate Rest Breaks; (5) Penalties Pursuant to Lab. Code § 203; and (6) Violation of Bus. & Prof. Code § 17200.[9] On February 13, 2014, Plaintiffs sent a letter to the Labor Workforce

---

7 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 94:16-95:4).

8 The piece rate subclass and the former employee subclass would also be appropriate as separate AWPA subclasses for violating the terms of the working arrangement between the workers and Defendants pursuant to 29 U.S.C. § 1832(c), and for failing to pay wages when due pursuant to 29 U.S.C. § 1832(a).

9 (Kingsley Decl., ¶ 3, Appendix, Exh. 1).

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

Development Agency, detailing these violations.[10]   On March 6, 2014, Defendants filed a Motion to Dismiss.[11]   On April 11, 2014, the Magistrate Judge issued a Findings and Recommendations denying Defendants' Motion in its entirety.[12]   On May 19, 2014, this Court issued an Order adopting the Findings and Recommendations in full.[13]   On June 9, 2014, Defendants filed its Answer to the Complaint.[14]

After settling the pleadings, the Parties engaged in discovery.[15]   On October 21, 2014, Plaintiffs propounded their first set of special interrogatories and requests for productions of documents.   In conjunction with its responses, Defendants' produced seven-hundred and seventy-nine (779) declarations[16] Defendants gathered from various employees indicating that Defendants provided rest periods to employees paid on a piece-rate basis.   Defendants also identified 6,249 Class Members.[17]   The Parties then engaged in extensive meet and confer efforts and agreed to a representative sampling of documents from 300 class members resulting in the production of hundreds of thousands of documents.[18]   On October 21, 2015, Plaintiffs deposed Jose Erevia, Defendants' Compliance Manager.[19]   Plaintiffs' also deposed Michele Noland and Nicholas Boos regarding the organizational structure of Defendants, the identities of its officers, and the relationship between Gerawan Farming Inc. and Gerawan Farming Partners, Inc.[20]

**B.   Summary of Relevant Facts**

**1.   Gerawan, the Workforce & the Production of Grapes and Other Fruit**

Gerawan grows and harvests peaches, plums, nectarines and apricots (collectively referred to as "stone fruits"), mandarin oranges, and grapes in California.[21]   Plaintiffs and the proposed class (the "Class") are seasonal agricultural workers in the harvest industry who have performed pre-harvest and harvest work for Gerawan from February 3, 2010 to the present (the "Class Period").   Gerawan

---

10 (Kingsley Decl., ¶ 4, Appendix, Exh. 2).
11 (*Id.*, at ¶ 5).
12 (*Id.*, at ¶ 5, Appendix, Exh. 3).
13 (*Id.*, at ¶ 6, Appendix, Exh. 4).
14 (*Id.*, at ¶ 6).
15 (*Id.*, ¶ 15, Appendix, Exh. 5 and 6).
16 Defendants also produced several additional unsigned Declarations from Class Members (*Id.* at ¶ 8).
17 (Kingsley Decl., ¶ 10, Appendix, Exh. 7).
18 (Kingsley Decl., at ¶¶ 11, 12, and 13 Appendix Exh. 8, 9, 10, 11, 12, and 13).
19 (Kingsley Decl., ¶ 16, Appendix, Exh. 18).
20 (*Id.*, at ¶¶ 17 and 18; Appendix, Exhs. 19 and 20).
21 (Kingsley Decl., ¶ 18, Appendix, Exh. 20); (Boos depo., 12:22-14:6).

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

employed approximately 6,249 class members during the Class Period.[22]  Class Members were paid on an hourly basis, on an hourly basis plus a modest piece-rate, or on a pure piece-rate basis.[23]

The production and harvesting of fruit happens in several discrete seasons, viewed as either harvest or pre-harvest.  Pre-harvest work generally begins in the winter months from approximately December or January, through March or April, depending on the crop. The harvest season for each type of fruit starts and ends at different times.  Defendants' harvest season generally commences in May with the mandarin orange harvest.[24]  The stone fruit harvest overlaps with the citrus harvest and continues through October.[25]  Although the exact timing of the grape harvest varies from year-to-year depending, the grape harvest typically begins in September/October and concludes in late October to December.[26]

## 2. Pre-Harvest

Each year, Defendants hire thousands of seasonal workers to perform tasks in preparation of the harvest—such as field marking, pruning, thinning, debudding, and deleafing—to maximize the yield.[27] Defendants also direct field workers to count the amount of fruit and tie colored ribbons to the crops to indicate the likely yield, a practice known as field marking.[28]  For some of these tasks, Defendants compensate the field workers using a uniform piece-rate compensation system.[29]

---

22 (Kingsley Decl., ¶ 10, Appendix, Exh. 7).

23 (Id., at ¶¶ 16, 17, 29, 30 and 32, Appendix, Exh. 16, 19, 24, 25, and 27); (Erevia depo., 29:25-30:15)("Q: So page 19 of the document, is that the current pay and it carries over on to page 20 of the document, is this the current pay policies and practices policy of the company? A: Up to where on page 20? Q: Well, I think it's just the top two paragraphs on page 20. A: Okay. Yes. Q: Okay. And would that vary at all by crew or by location? A: No, it's pretty much applicable to everyone. And as I explained earlier, it just depends on the type of work, hourly versus piece rate. Q: Okay. So the only distinction would be whether they were being compensated on a piece rate basis? A: Correct."); (Noland depo., Exh. 1, Bates Stamp 668); (Erevia depo., Exh. 9 at Bates Stamp 142).

24  (Kingsley Decl., ¶ 18, Appendix, Exh. 20); (Boos depo., 14:1-6).

25 (Id.).

26 (Kingsley Decl., ¶¶ 16, Appendix, Exh. 18 and 20); (Erevia depo., 15:10-24) ("Q: And how would you define that time of year? A: That would be in the fall. Q: So like September 21st it switches over or is there – A: no, it's when the season starts. We don't have a specific start date. It all depends on the year. Q: When typically though, is that around September 21st? A: It just depends. You could start as early as September, as late as October. Q: And when does it typically end? A: it could be as early as October, as late as December."); (Boos depo., 13:18-25)("Q: What is the harvest season for grapes at Gerawan Farming? A: What year? Q: In 2015. A: 2015? October, November. Q: Okay. What was the grape harvest season in 2014? A: October and November as well.").

27 (Kingsley Decl., ¶¶ 16, Appendix, Exh. 18 and 20); (Erevia depo., 20:13-21:3; 24:24-25:8; 70:11-18); (Boos depo., 14:15-15:2 )("Q: Okay. What type of activities do laborers perform during these off season? A: Pruning, thinning. Q: Very briefly for the record can you describe what pruning is? A: Removing unwanted branches or shoots leaves. Q: For which types of trees? A: All. Q: Okay. Can you briefly describe what thinning is? A: Removing of extra or additional fruit that would impede the growth of the desired fruit.").

28 (Kingsley Decl., ¶ 18, Appendix, Exh. 20); (Boos depo., 40:2-10).

29 (Kingsley Decl., ¶ 16, 17, and 32 Appendix, Exh. 18, 19 and 27); (Erevia depo., 66:24-67:21); (Noland depo., Exh. 1, Bates Stamp 668).

4

### 3. The Harvest

After working to prepare for the Fall grape harvest, Defendants' field worker employees begin to harvest the grapes in September or October.[30]  Throughout the harvest, Defendants assign crews of field workers to pick and package the grapes.[31]  Each field crew is composed of approximately ten (10) to (90) field workers.[32]  Defendants' office staff assigns crews to work in different blocks, consisting of 40-80 acre parcels of land, each day to perform work during the harvest season.[33]  Depending upon the daily block assignment received by the crew, the crew may spend the day working exclusively as grape pickers or packers.[34][35]  During the harvest, grape pickers harvest grapes from the vine, clip bunches, and place the grapes into tubs used to transport the grapes to field packing areas or more recently to the equipment yard.[36]  Grape packing commences several hours after grape picking begins.  The office staff also assigns each crew an official start time each day, which varies amongst the crews by ten (10) to

---

30 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 15:10-24).

31 (*Id.*, at ¶ 16 and 29, Appendix, Exh. 18 and 24); (Erevia depo., Exh. 9 at Bates Stamp 142).

32 (*Id.*, at ¶ 16, Appendix, Exh. 18); (Erevia depo., 25:24-26:7).

33 (*Id.*, at ¶ 18, Appendix, Exh. 20); (Boos 22:1-8)("Q: Can you describe what you mean by area? A; Generally we assign crews to a specific block or a set of rows to work for that day and a supervisor would also cover a number of blocks or sections of rows. Q: Okay. And can you describe what a block is? A: Yeah. Our blocks generally are 40 acre to 80 acre parcels, sections.");(Boos depo., 26:17-27:2)("Q: Do you have an understanding –you--previously you referred to scheduling for the harvest work, can you describe how that --each crew was given a particular ranch or block assignment at Gerawan? A: Yes. In general, we have an idea of the amount of fruit that's to be picked inn a certain block or set of rows. So an office staff would actually assign the amount of people to an area based on the amount of work that needs to be done. And we typically tend to rotate, you know the crews in specific areas so that they're not always in the same area day after day."); Boos depo. (28:25-29:9)("Q: Okay. Can you describe how the crew assignments are communicated to the crew bosses and crew employees themselves. A: Yes. Once the schedule is completed, a separate office staff will upload that or they put into a phone recording message, I believe, and the crew bosses know to call in to that number after a certain time in the afternoon and check for the scheduling in that phone message that relates to them, the location and the start times for each of the crews.")

34 (*Id.*, at ¶ 16, Appendix, Exh. 18); (Erevia depo., 67:25-68:12) ("Q: In other words, would you have a picker and packer or two pickers and a packer that might work together as a team? A: No. Q: That doesn't happen? So everybody does individualized work? A: Correct. Q: So then how is the ---so do all of the grape harvest employees pick and pack? A: No. Our picking and packing is separate, so pickers, they just pick. Q: Right. A: Packers, they just pack.").

35 In 2010, Defendants conducted grape packing in the field. The same field worker employees would pick and pack Defendants grapes. (*Id.*, at ¶ 18, Appendix, Exh. 20); (Boos depo., 46:11-15)("Q: In 2010 when the grape packing was conducted in the fields, would the person who was doing the grape packing be part of the same crew that was performing the harvesting? A: Yes."); Boos depo., 43:18- 49:7)("Q: And she has several listings for 1999 field packing – boxes, the time period being October 10th, 2010. Do you have any understanding of what that task may refer to field packing – boxes? A: Yes, I would assume it's packing of grapes. Q: Okay. Packing of grapes is conducted in the field, correct? A: Not anymore. Q: Okay. In 2010 it was conducted in the field? A: I believe so, and that's why it's designated as field packing. Q: When is your understanding as to when that changed? A: I don't recall exactly.")

36 (*Id.*, at ¶ 18, Appendix, Exh. 20); (Boos depo., 48:13-24 )("Q: There's a task there listed as 118 picking grapes – tubs. A: Yes. Q: Do you have an understanding as to what that is? A: Yes. Q: Can you describe what that is? A: That's the person --the non-packer who's actually harvesting grapes from the vine, clipping bunches, removing them, cleaning them, placing them in a tub to be transported to the person packing the fruit in its final box."); (Boos depo., 44:8-13)("Q: Okay. How has the task of field packing changed as in was it moved to a different location? A: Correct. Q: Okay. And where was that moved to? A: A yard, an equipment yard near the vineyards.").

5

fifteen (15) minutes.[37]  As a result of the uniform start times, all of Gerawan's field workers typically receive their scheduled rest breaks at the same time regardless of their assignment.

### 4.  Gerawan's Record Keeping and Pay Policies

Defendants utilize a uniform compensation system for all of its field workers, which compensates employees on an hourly basis, on an hourly basis plus a modest piece-rate, or on a pure piece-rate basis depending upon the type of work performed.[38]  As part of its uniform compensation system, Defendants paid all field workers at the same rate for all hourly work performed.[39] (Noland depo., Exh. 1, Bates Stamp 668).  Under its uniform piece-rate compensation policy, Defendants set a daily piece-rate for picking grapes that ranges from $2.50 to $5.00 per tub and packing at the rate of $1.00 up to $2.00 per box.[40]  Defendants also compensate employees for field marking on a piece-rate basis at the rate of $0.05-$0.10 per mark.[41]  On a given day, one of Defendants field workers could perform hourly and piece-rate work exclusively or a combination thereof.

Defendants maintain records of the piece-rate work performed by workers on daily "Tally Cards" that are distributed to field workers each day.[42]  Field workers receive the individual pre-printed "Tally Cards"[43] at the beginning of the workday, which employees known as "card punchers" use to

---

37 (Kingsley Decl., ¶ 18, Appendix, Exh. 20); (Boos depo., 31:19-32:9)("Q: Can you describe how the start times would be assigned to the particular crews? A: They're assigned the same way the location is, it's decided on and left in their instructional message. It's decided based upon the sunrise. Q: Let's say on a particular day, would all of the stone fruit harvest crews be starting roughly at the same time? A: Roughly, in general, yes. Q: Okay. So if the start time was 8 o'clock for the stone fruit, most of the crews start within 10 to 15 minutes of 8'oclock in the morning? A: Correct. Q: Okay.  Is the same true for the grape harvest crews? A: Yes, the harvest crews, yes.")

38 (Kingsley Decl., ¶¶ 16, 17, 32, and 30, Appendix, Exh. 18, 19, 27 and 25); (Erevia depo., 29:25-30:15); (Noland depo., Exh. 1, Bates Stamp 668); (Erevia depo., Exh. 9 at Bates Stamp 142).

39 (Kingsley Decl., ¶¶ 17 and 32, Appendix, Exh.  19 and 27); (Noland depo., Exh. 1, Bates Stamp 668).

40 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 66:24-67:21) ("Q:And then still on---let's see---still on that document on page 668 of the Bates stamp ---where did it go here? It talks about grape harvest towards the bottom of the page. So just so I understand then, picking rates range from $2.50 up to $5 per tub; is that right? A: Yes. Q: Okay. How would the -- who—well, first, how would the determination be made as to where the piece rate would flow between those two numbers? A: That's usually management's decision. I'm not really involved in setting those rates. Q: Do the rates vary, though, on a weekly basis, a daily basis? I mean like how often would they change? A: They do vary, it's not very common, it could occasionally change during the course of the day, so you may start ---Q: Oh, okay. A: So you may start with, for example, $3 per tub and then a decision is made to increase that to $3.50, so changes are made. Those are rare, but they do occur. And during the season it could change three, four times. It's not very much, but it does.").

41 (Kingsley Decl., ¶¶ 16, 17, and 32, Appendix, Exh. 18, 19, and 27); (Erevia depo., 70:11-18)("And what's field market? A: That's preplanting work. Q: Okay. And that lists, I guess, 5 to 10 per mark? A: Yes. Q: Would that be – that would be in the harvest season? A: No, that's in the offseason."); (Noland depo., Exh. 1, Bates Stamp 668).

42 (Kingsley Decl., ¶¶ 16 and 30, Appendix, Exh. 18 and 25); (Erevia depo., Exh. 9 at Bates Stamp 142; Exh. 13, 14, 15, and 16).

43 Since Defendants' workforce predominantly speaks Spanish, the Tally Cards are often also labeled as Tarjeta Registradora de Cajas.

6

record the number of pieces completed by the field workers.[44]   Throughout the day as Defendants field workers place grapes in the tubs, the field workers help the card punchers keep track of the amount of piece-rate work performed by attaching identical stickers, uniquely assigned to each picker, to the tally cards and each tub of grapes filled by that picker.[45]   At the end of each day the card puncher double punches the "Tally Card" to indicate the total amount of piece-rate work completed per worker.[46] Defendants then send the Tally Cards along with each employee's daily time sheet to Defendants' administrative offices for payroll processing.[47]

As with Defendants piece-rate compensation policy, Defendants use a universal minimum wage and overtime policy for all of its field workers.[48]   Defendants calculate the amount of minimum wages owed to employees on a weekly, rather than daily basis.[49]   When the weekly amount of compensation for piece-rate work falls below the minimum wage, Defendants include a "minimum wage assurance" on the employee's voucher.[50]   However, as a result of performing this calculation on a weekly basis, Defendants failed to pay field workers minimum wages when their aggregate wages for the week exceeded the minimum wage threshold, but their daily wages fell below the minimum amount.[51] Further, Defendants do not compensate field workers who performed piece-rate or a combination of

---

44 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 68:13-69:2) ("Q: And is – and so what's the process for keeping track of the number of tubs that the pickers pick?...THE WITNESS: As I indicated, everybody get an individual tally card which contains different information. And every piece that they produce is punched on that card. By MR. KINGSLEY: Q: By whom? A: We call them card punchers. Q: So that's another employee that's on site? A: It's an office rep that is tallying the cards."); Erevia depo., 85:5-15 )("Q: So they get the card in the morning? A: Correct. Q: I got it, okay. So the employee that's - --what was he called the one that does the punching? A: Card puncher. Q: Card puncher, that makes sense. The card puncher, he has those cards with him and he hands those out in the morning? A: Either or someone from the office or supervisors, but everything is controlled by the office.").

45 (Id.); (Erevia depo., 76:12-78:4).

46 (Id. at ¶¶ 16 and 30, Appendix, Exh. 18 and 25); (Erevia depo., 75:9-76:11);(Erevia depo., 81:16-21); (Erevia depo., Exh. 9 at Bates Stamp 142).

47 (Id., at ¶ 16, Appendix, Exh. 18); (Erevia depo., 17:25-20:12)

48 (Id.); (Erevia depo., 59:6-9)("Q: In other words, the policy, the payment of minimum wage applies to all of the crew workers that work in California? A: Correct.").

49 (Id.); (Erevia depo., 60:5-19)("Q: Okay. Do you know if that – I think it's referred to on the – I could be wrong about this, like minimum wage guarantee, if that's calculated on a weekly basis or if it's calculated on a daily basis? A: That's based on a payroll period which would be a work week. Q: So if someone were to have a poor day, let's say they were making – now we're at $9 an hour, let's say they made $8 an hour on average for the day but on the next day they were making on average $10 a day such that it averaged it out to $9 an hour, to your knowledge, would an enhancement be paid for the day where they made less than minimum wage? A: If the two days are within the same pay period, it's based on the entire work week.").

50 (Id.); (Erevia depo., 96:17-19).

51 (Id.); (Erevia depo., 94:16-95:4)(Q: Now, this is an interesting instance where, and I think you testified to this previously, but where the individual worked four and a quarter hours in a day and the total amount of compensation for that day was less than the minimum wage because minimum wage in this instance looking would be eight times 4.25 which would be $34. Do you see that on the third day? **A: Yeah. I'm at it, yes. Q: And so you think that the reason why it would have been paid that way is because it only – the minimum wage is only checked on a pay period basis? A: Correct**)(emphasis added).

7

piece-rate/hourly work separately for rest periods as required under California law.[52]

Defendants maintained records of all payments to and hours worked by field workers on paystubs and a separate "voucher" stapled to the paystubs.[53]   Regardless of the type of work performed each field worker received a paystub and voucher for each pay period. Vouchers issued to the field workers indicate the number of pieces, the piece rate, and hourly work completed during the weekly pay period.[54]   Therefore, by reviewing the paystubs/vouchers issued to field workers for each pay period, Plaintiffs can ascertain the amount of unpaid wages owed to each field worker for each pay period.

### 5.   Gerawan's Rest Period Policy

Defendants provide each employee with its Farming Human Resources Employee Manual.[55]   The rest period policy was last revised on July 20, 2009 and provides:[56]

> Employees are authorized and permitted to take 10-minute paid rest periods. Hourly employees on a fixed work schedule must take their rest periods as programmed by their supervisor. Employees working independently…or employees paid on a piece-rate basis must take them as close as practicable to the middle of each work period. A work period is defined as the time before and after the meal period.

> The number of 10-minute rest periods to which you are entitled is based on the total hours worked daily at the rate of 1 rest period per 4 hours of work or a major fraction thereof. No rest period is authorized if the total daily work hours are less than 3 ½.[57]

Defendants also orally advise field workers of their rights to rest periods during orientation each

---

52 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 62:3-63:1) (Q: Okay. What about the way in which overtime is paid, has that changed since February of 2010? A: Yes. Q: When was that changed? A: Currently it's different. Q: Well, what – okay, how is – how is it paid now? A: Well, now it's you have non-productive time that needs to be factored into the calculation. Q: And previously that wasn't factored into the calculation? A: Not to my knowledge. Q: And what would non-productive time be? A: That would be rest and recovery time periods during piece rate. And other time where the employee's not being productive or is asked to do other tasks that are not directly associated with piece rate activity. Q: And do you know approximately when that policy changed, when the non-productive time was factored into the regular rate? A: This year. Q: In 2015? Okay. Do you know approximately the month? A: This month.).

53 (*Id.*); (Erevia depo., 90:14-95:19); (Erevia depo., 90:22-91:18) ("Q: So this document, in combination of the paystub, would be given to the employee? A: Yes. Q: Now, the paystub that we looked at that was Exhibit - - that was Exhibit 12, that document would have a check attached to it? A: Correct. Q: So it would be one of sort of two-thirds of the page is that sub and then the top third or bottom third, I'm not sure which would be a detachable check? A: Both might be full pages, I'm not sure how they come or the format. Q: Fair enough. A: I know they're just together, but I'm not sure how they come. Q: But the check is not attached to the voucher, it would be attached to Exhibit 12, the paystub? If you want to look back. So in other words – A: The check comes with this. Q: That's Exhibit 12, yeah. A: Right, the check comes with this in an envelope.").

54   (*Id.*); (Erevia depo., 92:19-93:3).

55 (*Id.*); (Erevia depo., 30:16-19).

56 (*Id.*); (Erevia depo., 28:10-29:7).

57 (*Id.*, at ¶¶ 16 and 29, Appendix, Exh. 18 and 24); (Erevia depo., Exh. 9 at Bates Stamp 134); (Erevia depo., 30:16-19)("Q: All right. And then following on page 20 it talks about the rest period policy. Is that your understanding of what the current rest period policy is? A: Yes.").

8

season and the individual Class Members are generally reminded to take rest periods each day.[58] As part
of their daily reminder system, Defendants distribute tally cards to field workers performing piece-rate
with "avisos" that remind each worker to take their rest period each day during the harvest season and
when performing field-marking.[59]  Moreover, to ensure all piece-rate workers receive rest periods,
Defendants schedule rest periods for field workers at specific times each day.[60]  Due to Defendants strict
enforcement of these policies, field workers regularly receive their rest periods.

### 6. Gerawan's Employee Declarations Prove Field Workers Receive Rest Periods While Performing Piece Rate Work.

Defendants' produced seven-hundred and seventy-nine (779) declarations they gathered from field
workers attesting to the fact that Defendants provided them with rest periods.[61] Further, four-hundred and
fifty-one (451) of the field workers attested under the penalty of perjury that they performed piece-rate
work on behalf of Defendants and took their rest periods.[62]  Two-hundred and one (201) declarations were
provided by employees who did not perform piece-rate work. As these declarations make clear,
Defendants field workers regularly received rest periods while performing piece rate work.[63] Defendants
also conducted daily audits of crews to verify that field workers received all of their rest periods.[64]

### 7. Gerawan Provided Plaintiffs with Time and Pay Records for a Random Sample of 300 Field Workers and Class Counsel Retained an Expert to Analyze This Sample

For Class Certification purposes, Defendants agreed to produce the pay and piece-rate records for
three-hundred (300) field workers, resulting in the production of hundreds of thousands of documents.[65]
Plaintiffs retained Jeffrey S. Petersen ("Dr. Petersen"), an experienced expert witness with a Ph.D. in

58 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 45:5-12) ("Q: You said that's how it works for hourly employees, what about for piece rate employees? A: Piece rate employees are informed of the time. They're also regularly reminded, but they're also notified on their individual tally card what the break times are going to be for the day. Q: Oh, so that's printed on the tally card? A: Correct."); (Erevia depo., Exh. 16).

59  (Id.); (Erevia depo., 45:5-12).

60 (Id.); (Erevia depo., 52:10-53:4)("Q: And then it also says, if you look on three and four, it says "employees paid on a piece rate basis," so obviously that doesn't seem like that would apply to office workers, 'may take them as close as practicable to the middle of each work period.' A: Correct. Q: so do you know how that – that that's schedule? A: That was – this is based from our 2009 employee manual, and back in the days employees were informed to take it between their start time and lunch to take their break at that time. **They were not specifically given specific time as they are given now.** See that's what that means. Q: Oh, I see. Actually they have almost like an appointment time for their break? A: Correct. Correct.") (emphasis added).

61 (Id., at ¶¶ 8, 9 and 44, Appendix, Exh. 38-488).

62 (Id., at ¶ 9 and 44, Appendix, Exh. 38-488).

63 (Id., at ¶ 9).

64 (Id., at ¶ 36, Appendix, Exh. 38); (Bates Stamp 638-656).

65 (Id., at ¶ 19, Appendix, Exh. 21).

economics, to analyze the field worker sample provided by Defendants. After reviewing and analyzing the three-hundred (300) employee sample provided by Defendants, Dr. Petersen determined Defendants failed to pay two-hundred and ninety-three (293) field workers in the sample separately for rest periods with a ninety-five (95) percent confidence interval.[66] Dr. Petersen also determined Defendants failed to pay minimum wages to two-hundred and four (204) field workers in the sample with a ninety-five (95) percent confidence interval.[67] Based upon these calculations, Dr. Petersen found that Defendants owed two-hundred and ninety-three (293) field workers in the sample all wages owed within seventy-two hours of the end of their employment with Defendants with a ninety-five (95) percent and a margin of error of one and seventy-five one hundredths (1.75) percent.[68] By extrapolating the results of his analysis of the three-hundred (300) field worker sample to the entire Class, Dr. Petersen determined approximately 5,999 to 6,211 of the field workers would be included in the Piece Rate Subclass, approximately 3,918 to 4,580 field workers would be included in this Minimum Wage Subclass, and approximately 5,999 to 6,211 field workers would be included in the Former Employee Subclass.[69] If provided with the data for all of Defendants field workers, Dr. Petersen could determine the exact amount owed to each and every Class Member.[70]

## III.  LEGAL STANDARDS GOVERNING CLASS CERTIFICATION

Both U.S. and California Supreme Courts recognize that class actions promote civil justice and employee rights. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[c]lass actions serve an important function in our system of civil justice.") *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 340 (Cal. 2004) ("[California] has a public policy which encourages the use of the class action device.") (internal quotation omitted). Consistent with this principle, courts liberally grant class certification. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985), *cert. denied sub nom.*, *Wasserstrom v. Eisenberg*, 474 U.S. 946 (1985) (citations omitted) (in a "doubtful case … any error, if there is to be one, should be committed in favor of allowing a class action.").

The proper inquiry at the class certification stage is whether "plaintiff is asserting a claim which,

---

66 (Petersen Decl., ¶ 13).
67 (*Id.*, at ¶ 10).
68 (*Id.*, at ¶ 14).
69 (*Id.*, ¶ 10, 13, and 14).
70 (*Id.* at ¶ 7).

10

assuming its merit, will satisfy the requirements of Rule 23 …" *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981); ); *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010); *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir.1983) (holding that "it is improper to advance a decision on the merits to the class certification stage"). Thus, in adjudicating a motion for class certification, the Court is "bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 U.S. 891, 901 n. 17 (9th Cir. 1975); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 116 F.R.D. 384, 388 (E.D. Cal. 1986). A court's resolution of a class certification motion should not become "a preliminary inquiry into the merits" of the case, *Eisenberg*, 417 U.S. at 177, or who will ultimately prevail, *id.* at 177-78.

Accordingly, though Gerawan may argue the merits, Plaintiffs are not required to prove their claims at the class certification stage. Nothing in either "the language or history of Rule 23 … gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974); *Staton v. Boeing*, 327 F.3d 938, 954 (9th Cir. 2003) ("it is improper to advance a decision on the merits at the class certification stage"). "[B]ecause the early resolution of the class certification question requires some degree of speculation...all that is required is that the Court form a reasonable judgment on each certification requirement." *Whiteway v. FedEx Kinko's Office & Print Servs.*, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006) (citation and internal quotation marks omitted).

Ultimately, the Court has broad discretion in certifying a class action. *Armstrong v. Davis,* 275 F.3d 849, 872, fn. 28 (9th Cir. 2001); *Dukes v. Wal-Mart,* 509 F.3d 1168, 1176 (9th Cir. 2007). It should be noted, moreover, that AWPA cases and wage and hour cases under California law are routinely certified. *See e.g., Arredondo v. Delano Farms Co. et al.*, Case No. 1:09-cv-01247 (Docket #85) (E.D. Cal. 2011) (order certifying a class of grape workers who performed unpaid pre-shift and post-shift work, and were not reimbursed for expenses related to purchase of work tools); *Munoz v. Giumarra Vineyards Corp.*, No. 1:09-CV-00703-AWI, 2012 WL 2617553, at *37 (E.D. Cal. July 5, 2012) (order certifying a class of grape workers who did not receive proper meal breaks and post-shift work); *Gutierrez v. Kovacevich "5" Farms*, 2004 U.S. Dist. LEXIS 29476 (E.D. Cal. 2004) (off-the-clock

work); *Dilts v. Penske Logistics, LLC,* 267 F.R.D. 625 (S.D.Cal. 2010) (reimbursement of expenses, among other things); *Ortega v. J.B. Hunt Transport, Inc.,* 258 F.R.D. 361 (C.D.Cal. 2009) (proper rest and meal breaks); *Cervantez v. Celestica Corp.,* 253 F.R.D. 562 (C.D.Cal. 2008) (pre-shift, post-shift and premium rest and meal period wages). As will be shown below, the requirements of Rule 23(a) and (b) have been met for Plaintiffs' claims. Accordingly, class-action treatment is warranted.

## IV.  THE REQUIREMENTS OF RULE 23(A) ARE SATISFIED

Courts certify Rule 23 class where:

> (1) the class is so numerous that joinder of all members if impracticable;
> (2) there are questions of law and fact common to the class; (3) the claims
> and defenses of the representative parties are typical of the claims or
> defenses of the class; (4) the representative parties will fairly and
> adequately protect the interests of the class.

FRCP 23(a); *Dukes,* 509 F.3d at 1176.

### A.  The Proposed Subclasses Are So Numerous As To Make Joinder Impracticable

Under Rule 23(a)(1), a class action may be maintained where "the class is so numerous that joinder of all members is impracticable." This rule requires only a showing that joinder is difficult or inconvenient, not that it is impossible. *See Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964); *Cruz v. Dollar Tree Stores, Inc.,* No. 07-2050 SC, 2009 WL 1458032, at *5 (N.D. Cal. May 26, 2009) *modified in part,* 270 F.R.D. 499 (N.D. Cal. 2010); *Cartwright v. Viking Industries,* 2:07-CV-02159-FCD-EFB, 2009 WL 2982887, at *12 (E.D. Cal. 2009). In determining whether joinder would be impracticable, a court may consider not only the sheer number of class members, but also "the nature of the action, the size of the individual claims, [and] the inconvenience of trying individual suits." *Cruz,* No. 07-2050SC, 2009 WL 1458032, at *5; *Evans v. IAC/Interactive Corp.,* 244 F.R.D. 568, 575 (C.D. Cal. 2007). The proponents of class certification need not allege exact numbers of class members, "but may instead make a reasonable estimate on the basis of the size of a disputed offering." *Whiteway,* No. C 05-2320 SBA, 2006 WL 2642528, at *4; *Krzesniak v. Cendant Corp.,* No. C 05-05156 MEJ, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007) (internal citations omitted).

Gerawan admits that there are approximately 6,249 field workers who are proposed Class

12

1   Members.[71]  As explained below, Defendants provided Plaintiffs with time and pay records for a random

2   sample of 300 of these individuals.

3     An analysis of this data revealed that of the 300 Class Members, two-hundred and ninety-three

4   (293) of the Class Members met the parameters of the Piece Rate Subclass.[72]  When Plaintiff's expert,

5   Dr. Petersen, extrapolated this number as to the entire Class of 6,249 people, his results indicated that

6   approximately 5,999 to 6,211 of the 6,249 Class Members would be included in the Piece Rate

7   Subclass.[73]  The same analysis was performed for the Minimum Wage Subclass and the Former

8   Employee Subclass.[74]  Dr. Petersen determined that 204 of the 300 Class Members met the parameters

9   of the Minimum Wage Subclass, and an extrapolation indicated that approximately 3,918 to 4,580 of the

10  6,249 Class Members would be included in this subclass.[75]  Finally, an analysis of the Former Employee

11  Subclass indicated that 5,999 to 6,211 of the 300 Class Members met the parameters of the Former

12  Employee Subclass, and an extrapolation indicated that approximately 5,999 to 6,211 of the 6,249 Class

13  Members would be included in the Former Employee Subclass.[76]

14    The subclasses are sufficiently numerous to warrant certification.  Courts generally recognize

15  that joinder is impracticable where a class contains more than 21-40 members. *See e.g. Immigrant*

16  *Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS,* 306 F.3d 842, 869 (9th Cir.2002) (finding

17  numerosity "solely on the basis of the number of ascertained class members ... and listing thirteen cases

18  in which courts certified classes with fewer than 100 members"; *accord Jordan v. County of Los*

19  *Angeles,* 669 F.2d 1311, 1319 & n. 10 (9th Cir.1982) *vacated on other grounds,* 459 U.S. 810 (1982);

20  *Rodriguez v. Carlson,* 166 F.R.D. 465, 474 (E.D. Wash. 1996) (class of over 100 farm workers satisfied

21  Rule 23(a)(1) requirements in AWPA case); *Aguirre v. Bustos,* 89 F.R.D 645 (Dist. N.M 1981) (class of

22  60-100 farmworkers satisfied the numerosity requirements in FLCRA case).  The huge size of these

23  potential classes makes joinder of all claims beyond impracticable.

24    Additionally, the proposed class is ascertainable based on payroll records provided by Gerawan,

25

26  71 (Kingsley Decl., ¶ 10, Appendix, Exh. 7).

  72 (Petersen Decl., ¶ 13).

27  73 (*Id.*).

  74 (*Id.*, at ¶ 10 and 14).

28  75 (*Id.* at ¶ 10).

  76 (*Id.*, at ¶ 14).

13

which can be used to easily identify Class Members.   Defendants maintained records of all payments to, hours worked by, and the number of pieces completed by field workers on paystubs and a separate page stapled to the paystubs referred to as a voucher.[77]   Therefore, by reviewing the paystubs and vouchers issued to field workers for each pay period, Plaintiffs and Class Counsel can ascertain who is in each subclass and the amount of wages/penalties owed to them. As such, there can be no dispute that the proposed class satisfies the numerosity and ascertainability requirements.

## B. **Common Questions of Law and Fact Predominate**

Under Fed. R. Civ. P. 23(a)(2), Plaintiff must demonstrate that there are questions of law or fact common to the class.  Commonality is construed permissively and flexibly.  *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (characterizing commonality as a "minimal" requirement); *Staton,* 327 F.3d at 953. Not all questions of law and fact need to be common.

Fed. R. Civ. P. 23, which governs class actions, does not require the named plaintiffs to be identically situated with all other class members.  It is enough if their situations share a 'common issue of law or fact' and are 'sufficiently parallel to insure a vigorous full presentation of all claims for relief. *California Rural Legal Assistance, Inc. v. Legal Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990) (internal citations omitted); *see also Parra v. Bashas, Id* at 978.  "The commonality test is qualitative rather than quantitative—one significant issue common to the class may be sufficient to warrant certification." *Dukes,* 509 F.3d at 1225.  To establish commonality, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies." *Hanlon*, 150 F.3d at 1019.

The common-questions requirement of Rule 23(a)(2) is readily satisfied in this case, as there are common questions of both fact and law. In the Piece-Rate Subclass, common questions include: whether Gerawan's piece-rate policy failed to provide properly paid rest breaks.  In the Minimum Wage Subclass common questions include whether Gerawan's pay policies failed to compensate employees when they earned minimum wages on a weekly basis but failed to earn minimum wage on a specific day in that week.  Finally, in the Former Employee Subclass common questions include whether Gerawan failed to

---

77 (Kingsley Decl., at ¶ 16, Appendix, Exh. 18); (Erevia depo., 90:14-95:19); (Erevia depo., 90:22-91:18).

14

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

compensate its former employees for all wages due at the time of their separation with the company. *Valenzuela v. Giumarra Vineyards Corp.*, 614 F. Supp. 2nd at 1101-03 (E.D. Cal. 2009) ("Plaintiff's allegations of discharge from seasonal agricultural work states a claim under California's waiting time penalty laws."). Similar questions have been found to be common and predominating in the context of other AWPA class actions *See e.g. Arredondo*, Case No. CV F09-1247 LJO DLB, 2011 WL 1488612 (certifying a class of grape workers who worked unpaid time and were not reimbursed for tools); *Martinez v. Mecca Farms, Inc.* 213 F.R.D. 601 (S.D. Fla. 2002); *Rodriguez v. Carlson*, 166 F.R.D. 465, 474 (E.D. Wash. 1996); *Leyva v. Buley*, 125 F.R.D. 512 (E.D. Wash. 1989); *Montelongo, v. Meese*, 803 F.2d 1341, 1351 (5th Cir. 1986).

### 1. Legal Framework Piece-Rate Pay and Commonality of Piece-Rate Sub-Class

Compensation on a "'Piece rate basis' is a method of payment based on units of production or a fraction thereof." 8 CA ADC § 11140, para. 2.(L). Gerawan utilizes two piece-rate methods. A strict method whereby employees are only paid per unit of production. The second is a "modified" piece-rate that combines a piece-rate with an hourly rate.

Under California law, workers are entitled to receive paid rest breaks. Wage Order 14 provides in pertinent part the following with regards to California's rest period requirement:

> Every employer shall authorize and permit all employees to take rest periods . . .
> Authorized *rest period time shall be counted, as hours worked for which there shall be no deduction from wages.*"

8 CA ADC § 11140, para. 12 (emphasis added). This same Wage Order defines "Hours Worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.*, para. 2.(G). "Hours Worked," in turn, must be compensated at the employees' regular rate and in no case less than the minimum wage. 8 CA ADC § 11000 (Order Regulating the Minimum Wage), para. 2.

It follows that under a piece-rate system, since employees are paid for units produced, unless they are separately compensated at an hourly rate of no less than the minimum wage for the time they spend taking rest breaks, any rest break they take is unpaid or underpaid. *See Bluford*, 216 Cal. App. 4th at 872 (Under California law, "rest periods must be separately compensated in a piece-rate system. Rest periods are considered hours worked and must be compensated."); *Armenta*, 135 Cal.App.4th at 316-18 (holding

15

that where a piece-rate method of compensation is used, the employer is required to pay at least the minimum wage for each hour worked); *Ontiveros v. Zamora*, 2009 WL 425962, 3-5 (E.D.Cal., 2009) (plaintiffs properly alleged that strict piece-rate failed to properly compensate for state-mandated rest breaks). In other words, unless the employer provides hourly compensation of no less than the minimum wage for every 10-minute rest period taken by the employee, the employer is providing no compensation whatsoever during rest periods. *Id.*[78] An employer that fails to provide a rest period "in accordance with an applicable order of the Industrial Welfare Commission . . . shall pay the employee one additional hour of pay . . . ." Cal. Labor Code § 226.7. This Court has held that grape workers may seek recovery of additional wages for missed rest periods in a private suit such as this one. *Valenzuela v. Giumarra Vineyards Corp.*, 614 F.Supp.2d 1089, 1101 (E.D.Cal. Feb. 20, 2009). Whether Gerewan's piece-rate schemes are lawful is a predominating question affecting the entire Piece-Rate Subclass.[79]

Moreover, as a result of Defendants' uniform rest period and compensation policies, there are common facts affecting the entire Piece-Rate Subclass. As explained above, Defendants maintain a universal rest period policy for all fieldworkers. In addition to providing field workers with a copy of the written rest period policy, Defendants also orally advise all field workers of their rights to receive rest periods and provide daily written reminders to take rest periods, including scheduling rest periods.[80]

---

78 *Bluford* suggests that rest periods must be paid at the average hourly rate, not just at minimum wage. See *Bluford, supra*, 216 Cal. App. 4th at 872 ("Under the California minimum wage law, employees must be compensated for each hour worked at either the legal minimum wage or the contractual hourly rate . . ."). On November 1, 2013, the California Labor Commissioner, Julie Su, issued to DLSE staff a Memorandum entitled *The Minimum Wage and Rest Period Obligations of Employers in the Context of Piece Rate Employment* in which she stated the state's interpretation of Section 12 (Rest Periods) of all IWC wage orders to be that "the hourly rate payable to piece-rate employees during rest periods is the hourly piece-rate wage calculated by dividing the total weekly piece-rate earnings by the total hours of piece-rate work performed in the week." New state law through AB 513, discussed *infra*, confirms the labor commissioner's interpretation; Cal. Dept. Industrial Relations, DLSE, Julie A. Su, Memorandum, The Minimum Wage and Rest Period Obligations of Employers in the Context of Piece Rate Employment (Nov. 1, 2013).

79 On March 5, 2015, the Assembly Committee on Insurance introduced Assembly Bill 1513 ("AB 1513"), which originally dealt with issues related to studies performed by the Commission on Health Safety and Workers' Compensation. On March 26, 2015, the California Assembly amended the bill, codifying the courts' rulings in *Gonzalez v. Downtown LA Motors, LP*, 215 Cal.App.4th 36 (2013) and *Bluford* that nonproductive time, rest breaks, and recovery breaks must be separately compensated. The March 26, 2015 version of AB 1513 and subsequent drafts provided an affirmative defense to employers who failed to timely compensate employees separately for rest periods from July 1, 2012 to December 31, 2015. However, the Legislature specifically prohibited employers from asserting this affirmative defense against "[c]laims asserted in a court filing prior to March 1, 2014 or claims asserted prior to March 1, 2014 and amended prior to July 1, 2015." On September 9, 2015 the California Senate passed the September 9, 2015 version of AB 1513, which was enrolled without changes on September 16, 2015. On October 10, 2015 Governor Jerry Brown approved AB 1513. Plaintiffs filed their Class Action Complaint against Defendants on February 3, 2014. Therefore, Defendants cannot assert the affirmative defense proscribed by AB 1513.

80 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 45:5-12);(Erevia depo., Exh. 16); (Erevia depo., 52:10-53:4).

16

Defendants produced four-hundred and fifty-one (451) declarations from field workers who attested to taking rest periods while performing piece-rate work in accordance with the rest period policy.[81]

As with its uniform rest period policy, Defendants also utilize a universal compensation system that compensates field workers on an hourly basis, on an hourly basis plus a modest piece-rate, or on a pure piece-rate basis depending upon the type of work performed.[82] As part of its universal compensation system, Defendants pay all field workers the same daily piece-rate for picking and packing grapes. [83] Defendants' records indicate how much each Class Member was paid for piece on a given day.[84] From February 1, 2010, Defendants did not provide any compensation to field workers for rest periods.[85] As such, there is a common rest period policy applicable to all Piece-Rate Subclass Members, and a common policy of failing to compensate the Subclass Members. Thus, common facts or questions predominate. The only legal question remaining, whether Defendants' policies resulted in Piece-Rate Subclass Members taking their breaks "unpaid" in violation of the law, is a merits question.

### 2. Legal Framework for Minimum Wage and Commonality of Minimum Wage Subclass

"Under California's minimum wage law, employees must be compensated for each hour worked at either the legal minimum f or the contractual hourly rate, and compliance cannot be determined by averaging hourly compensation." *Bluford*, 216 Cal. App. 4th at 872; *Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314, 324 (2005 ("While the averaging method utilized by the federal courts to assess whether a minimum wage violation has occurred may be appropriate when considered in light of federal public policy, it does not advance the policies underlying California's minimum wage law and regulations.") (emphasis added); *see also Cardenas v. McLane FoodServices, Inc.*, 796 F. Supp. 2d 1246, 1252 (C.D. Cal. 2011)(finding that the federal averaging method did not apply to the payment of piece-rate wages

---

81 (Kingsley Decl., ¶¶ 9 and 44, Appendix, Exh. 38-450).

82 (*Id.*, ¶¶ 16, 17, 30, and 32, Appendix, Exh. 18, 19, 25, and 27); (Erevia depo., 29:25-30:15); (Noland depo., Exh. 1, Bates Stamp 668); (Erevia depo., Exh. 9 at Bates Stamp 142).

83 (Kingsley Decl., ¶¶ 17 and 32, Appendix, Exh. 19 and 27); (Noland depo., Exh. 1, Bates Stamp 668).

84 (Petersen Decl., ¶¶ 11, 12, and 13).

85 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 62:3-63:1) (Q: Okay. What about the way in which overtime is paid, has that changed since February of 2010? A: Yes. Q: When was that changed? A: Currently it's different. Q: Well, what – okay, how is it paid now? A: Well, now it's you have non-productive time that needs to be factored into the calculation. Q: And previously that wasn't factored into the calculation? A: Not to my knowledge. Q: And what would non-productive time be? A: That would be rest and recovery time periods during piece rate. And other time where the employee's not being productive or is asked to do other tasks that are not directly associated with piece rate activity. Q: And do you know approximately when that policy changed, when the non-productive time was factored into the regular rate? A: This year. Q: In 2015? Okay. Do you know approximately the month? A: This month.).

17

under California law). This was reiterated again recently in *Gonzalez v. Downtown LA Motors, LP*, 215 Cal.App.4th 36 (2013) where the Court concluded that "[a]veraging piece-rate wages over total hours worked results in underpayment of employee wages" *Id*. at 50.

Whether Gerawan's pay policies failed to compensate employees when they earned minimum wages on a weekly basis but failed to earn minimum wage on a specific day in that week is a question that predominates over the entire Minimum Wage Subclass. As with Defendants piece-rate compensation policy, Defendants use a universal minimum wage policy for its field workers.[86] Defendants calculate the minimum wages owed to employees on a weekly, rather than daily basis.[87] When the weekly amount of compensation for piece-rate work falls below the minimum wage, Defendants include a "minimum wage assurance" on the employee's voucher.[88] However, as a result of performing this calculation on a weekly basis, Defendants failed to pay field workers minimum wages when their aggregate wages for the week exceeded the minimum wage, but their daily wages fell below the minimum.[89] This weekly averaging violates California law, which requires that minimum wages be paid for *each hour* worked in a day. See *Armenta, supra*, 135 Cal. App. 4th at 324 ("the FLSA model of averaging all hours worked "in any work week" to compute an employer's minimum wage obligation under California law is inappropriate. The minimum wage standard applies to each hour worked by [employees] for which they were not paid.").

Common questions of fact also predominate over the Minimum Wage Subclass. As part of its uniform compensation system, Defendants maintained records of all payments to and hours worked by field workers on paystubs and a separate page stapled to the paystubs referred to as a voucher.[90] Regardless of the type of work performed, each field worker received a paystub and voucher for each pay period. Vouchers issued to the field workers indicate the number of pieces, the piece rate, and hourly work completed during the weekly pay period.[91] Thus, by reviewing the paystubs and vouchers issued to field workers for each pay period, Plaintiffs and Class Counsel can ascertain the amount of unpaid wages owed to each field worker for each pay period.

---

86 (Kingsley Decl., ¶ 16, Appendix, Exh. 18); (Erevia depo., 59:6-9).
87 (*Id*.); (Erevia depo., 60:5-19).
88  (*Id*.); (Erevia depo., 96:17-19).
89 (*Id*.); (Erevia depo., 94:16-95:4).
90 (*Id*.); (Erevia depo., 90:14-95:19).
91  (*Id*.); (Erevia depo., 92:19-93:3).

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

As explained above, Plaintiff's expert, Dr. Petersen, conducted this determination for the sample and determined that of the three-hundred (300) Class Members, two-hundred and four (204) earned less than the minimum wage on at least one shift.[92]   As such, not only is there a common policy applicable to this subclass, determining liability is subject to common proof based on Defendants' records.

### 3. Framework for the Payment of Waiting Time Penalties and Commonality of Former Employee Subclass

Labor Code § 203 provides "if an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty. . ." for up to 30 days. Lab. Code § 203; *Mamika v. Barca*, (1998) 68 Cal.App.4th 487, 492. In prior grape harvesting cases considered by this Court, the Court has routinely found employees discharged from seasonal agricultural work are entitled to waiting time penalties. *Doe v. D.M. Camp & Sons*, No. CIV-F051417AWISMS, 2009 WL 921442, at *12 (E.D. Cal. Mar. 31, 2009)(*citing Smith v. Sup. Ct.*, 39 Cal.4th 77, 86 (2006)); *Valenzuela v. Giumarra Vineyards Corp.*, 614 F. Supp. 2d 1089, 1103 (E.D. Cal. 2009). This comports with the public policy that favors the full and prompt payment of earned wages. (*See, e.g., Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7; *Mamika* 68 Cal.App.4th at 492). Plaintiffs and the Former Employee Sub-Class are entitled to waiting time penalties as a result of Defendants' failure to pay minimum wages or compensate field workers separately for rest periods. Whether Gerawan failed to compensate its former employees for all wages due at the time of their separation with the company is a predominating question affecting the entire Subclass.

Each year, Defendants hire thousands of seasonal workers to perform tasks in preparation of the harvest.[93]   Defendants do not employ any year-round field workers.[94]   At the conclusion of each harvest, Defendants lay-off all the seasonal field workers.[95]   The period of unemployment experienced by field workers varies each year depending upon the conditions of the previous seasons and forthcoming harvest.[96]   During this period, many of the field workers apply for and receive

---

92 (Petersen Decl., ¶ 10).

93 (Kingsley Decl., ¶ 16, Appendix, Exh. 18) (Erevia depo., 20:13-21:3; 24:24-25:8; 70:11-18).

94 (*Id.*); (Erevia depo., 24:11- 17)("Q: Sure. And I'll try here, you many know this, but do you know how many full-time crew labor employees partners has employed since February of 2010? A: Full-time crew labor employees? Q: Yeah. A: We don't really have full-time labor employees, they're all seasonal.").

95 (Kingsley Decl., ¶¶ 23, 24, 26, 27, 42, and 43, Appendix, Exh. 22, 23, 37, and 38); (Amaro Decl., ¶¶ 3-8); (Urzua Decl., ¶¶ 3-8).

96 (Kingsley Decl., ¶¶ 23, 24, 26, 27, 42, and 43, Appendix, Exh. 22, 23, 37, and 38); (Amaro Decl., ¶¶ 3-8); (Urzua Decl., ¶¶ 3-8).

19

unemployment based upon their seasonal status.[97]  Given that Defendants discharged all field workers at the conclusion of each harvest season, common facts undeniably affect the entire Former-Employee Subclass.  Furthermore, whether Gerawan failed to compensate the Subclass for all wages due at the time of their separation each season is a predominating question.  As such, if Plaintiff is able to certify the Piece Rate Subclass or Minimum Wage Subclass, it necessarily follows that this Subclass should be certified.

## C. Plaintiffs' Claims Are Typical of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3).  *Hanlon*, 150 F.3d at 1020.  This is met where the named plaintiffs' claims "*arise from the same remedial and legal theories*" as the class claims. *Arnold v. United Artists Theatre Circuit*, 158 F.R.D. 439, 449 (1994). In other words, "named plaintiffs need not be identically situated with all other class members.  It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.* 917 F.2d 1171, 1175 (9th Cir. 1990) (internal quotations omitted).  The Ninth Circuit interprets the typicality requirement permissively.  *Kamar v. Radio Shack Corp*, 254 F.R.D. 387, 39 (C.D. Cal. 2008) (*citing Hanlon* 150 F.3d at 1020).  A plaintiffs' claims are typical if "reasonably coextensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

Here, Plaintiffs and the Class were all subject to the same practices of Defendants.  Throughout the harvest periods, Plaintiffs and the Class were paid on a piece-rate basis.[98]  They worked at least one shift where they were not paid minimum wage.[99]  Finally, each of the Plaintiffs were laid off.[100]

The data provided by Gerawan shows that Plaintiffs worked as field employees and have the same claims as those Class Members employed during the Class Period.

## D. Plaintiffs and Class Counsel Will Adequately Represent the Class

Adequacy requires that "the representative parties will fairly and adequately protect the interests of

---

97 (Kingsley Decl., ¶¶ 42-43, Appendix, Exh. 37 and 38); (Urzua Decl., ¶¶ 5 and 8).

98 (Kingsley Decl., ¶¶ 23, 24,  26, and 27,  Appendix, Exh. 22 and 23); (For Amaro *see* Bates Stamps 399, 400, 401, 402, 403, 404, 447, 448, 449, 450, 516, 517, 518, 519, 520, 521, 522, 523); (For Urzua *see* Bates Stamps 195, 196, 197, 198, 199, 200); (Amaro Decl., ¶ 10); (Urzua Decl., ¶ 13).

99 (Kingsley Decl., ¶¶ 23 and 26); (Bates Stamps 400, 401, 403, 447, and 519); (Bates Stamp 195, 196, 198, 200).

100 (Kingsley Decl., ¶¶ 23, 24, 26, 27, 42, and 43, Appendix, Exh. 22, 23, 37, and 38); ( For Amaro *see* Bates Stamp 399-414, 415-461, 462-492, 493-523); (For Urzua *see* Bates Stamp 28-32, 171-201, 238-263); (Urzua Decl., ¶¶ 3-8);; Amaro Decl., ¶¶ 3-8).

the class." FRCP 23(a)(4).  Legal adequacy encompasses two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d 1011 (*citing Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).

Plaintiffs have each declared that they wish to serve as class representatives and have no conflicts with the Class concerning the issues which are the subject of the litigation.[101] Plaintiffs are pursuing damages for the same violations of law that each Class Member suffered and will vigorously do so. Additionally, Plaintiffs have cooperatively participated in the litigation, providing information to their attorneys and aiding Class Counsel in understanding the applicable policies and procedures.[102] Gerawan has no basis for asserting any unique defenses against Plaintiffs it could not assert another Class Member.

Counsel are competent and experienced in litigating large employment Class Actions, and in litigating Class Actions involving agricultural employees. Counsel have experience in prosecuting wage and hour class actions, employment litigation generally, and class actions specifically dealing with the issues presented here.  The qualifications of counsel are set forth in the accompanying declarations.[103]

As the attached Declaration of Mario Martinez shows, Martinez Aguilasocho & Lynch, APLC and its attorneys have extensive class-action experience, particularly in the area of wage and hour actions and are very familiar with this work force and the claims brought in this Action.[104]  They have been appointed class counsel in a variety of wage and hour class actions.[105]

As the attached Declaration of Eric B. Kingsley shows, Kingsley & Kingsley and its attorneys have extensive class-action experience, particularly in the area of wage and hour actions.  Eric Kingsley has been appointed class counsel in a variety of class actions and routinely represents employees in wage and hour actions.[106]  Kingsley and Kingsley is well-qualified to serve as co-class counsel.[107]

## V.    THE REQUIREMENTS OF RULE 23(b)(2) and (b)(3)  ARE SATISFIED

A class action may be maintained if the requirements of 23(a) are satisfied and if the plaintiff can

---

101 (Kingsley Decl., ¶¶ 24 and 27, Appendix, Exh. 22 and 23); (Amaro Decl., ¶¶ 15-16); (Urzua Decl., ¶¶ 18-19).
102 (Kingsley Decl., ¶¶ 22, 24, 25, and 27, Appendix, Exh. 22 and 23); (Amaro Decl., ¶ 16); (Urzua Decl., ¶ 19).
103 (Kingsley Decl., ¶¶ 20-21); (Martinez Decl., ¶¶ 2-8).
104 (Martinez Decl., ¶¶ 2-8).
105 (*Id.*, at ¶ 7).
106 (Kingsley Decl., ¶¶ 20-21).
107 (*Id.*).

21

meet the requirements of Rule 23(b)(1), Rule 23(b)(2), or Rule 23(b)(3).  In this case, Plaintiffs can meet the requirements of Rule 23(b)(2) and Rule 23(b)(3).

## A. **Plaintiffs Meet the Requirements of Rule 23(b)(2)**

Rule 23(b)(2) requires that the defendant has "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  However, Rule 23(b)(2) is not limited to actions requesting only injunctive or declaratory relief, but may include cases in which:

> (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonable necessary and appropriate were the plaintiff to succeed on the merits."

*Dukes*, 509 F.3d at 1186 (internal quotation omitted) (ruling that Rule 23(b)(2) may apply despite large monetary claims for back pay and punitive damages) See also *Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 642 (N.D. Cal. 2007) ("Class actions certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages" where the claim for injunctive relief is the primary claim.) (internal quotation omitted).

Claims for money relief may be certified as part of a Rule 23(b)(2) class, but the rule does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.'" *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 753 (9th Cir.2010) (internal quotation marks omitted) (citing *Dukes*, 603 F.3d at 615 n. 38). In a recent decision, the district court in *Gardner v. Shell Oil Co.*, No. C09-05876 CW, 2011 WL 1522377 (N.D. Cal. Apr. 21, 2011), granted class certification under Rule 23(b)(2).  In that case, the district court held that plaintiffs have a substantial claim for injunctive relief, because they seek to end long-standing employment policies.  *Id.*  The district court held that the claims for injunctive and monetary relief were closely related because back wages were sought for those who were deprived of lawful breaks due to the policies plaintiffs sought to enjoin.

This case is being brought to redress Defendant's past and continuing behavior concerning the underpayment of wages/overtime and rest breaks.  Plaintiffs have requested injunctive relief in their Complaint.  If Plaintiffs are meritorious, they will request that Defendants be required to pay its

Plaintiff's Notice Of Motion And Motion For Class Certification

1  employees in compliance with the California Labor Code and Wage Orders.  Therefore, injunctive relief

2  is necessary if Plaintiffs succeed on the merits, and class certification under Rule 23(b)(2) is appropriate.

3  **B.  Plaintiffs Meet the Requirements of Rule 23(b)(3)**

4  A class may be certified under Rule 23(b)(3) when "questions of law or fact common to the

5  members of the class predominate over any questions affecting only individual members," and a class

6  action "is superior to other available methods for the fair and efficient adjudication of the controversy."

7  FRCP 23(b)(3) "encompasses those cases in which a class action would achieve economies of time, effort,

8  and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing

9  procedural fairness or bringing about other undesirable results." *Kamar* 254 F.R.D. at 398 (*citing Hanlon*

10  150 F.3d at 1020).  The requirements of both predominance and superiority are satisfied here.

11  **1.  Common Questions Predominate Over Individual Questions**

12  The predominance inquiry focuses on whether the class is "sufficiently cohesive to warrant

13  adjudication by representation." *Hanlon,* 150 F.3d at 1022 (internal quotation omitted).  *See Local Joint*

14  *Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162, *cert.*

15  *denied,* 534 U.S. 973 (2001).  "When common questions present a significant aspect of the case and they

16  can be resolved for all members of the class in a single adjudication, there is clear justification for

17  handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022

18  (internal quotation omitted).  The existence of some individual differences between class members does

19  not defeat predominance. *Local Joint Executive Bd.,* 244 F.3d at 1163.

20  To establish predominance of common issues, Plaintiffs need not show that the "legal and factual

21  issues raised by the claims of each class member are identical." *Kamar*, 254 F.R.D. at 399.  Rather,

22  predominance tests whether the proposed class is "sufficiently cohesive to warrant adjudication by

23  representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623

24  (1997)).  Central to this inquiry is 'the notion that the adjudication of common issues will help achieve

25  judicial economy.'" *Kamar*, 254 F.R.D. at 399 (quoting *Zinser v. Accufix Research Inst. Inc.*, 253 F.3d

26  118, 1189 (9th Cir. 2001)).  "Because no precise test can determine whether common issues predominate,

27  the Court must pragmatically assess the entire action and the issues involved." *Id.*

28  There are three main questions that predominate in this action: 1) whether Gerawan failed to

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

properly compensate Class members for all hours worked at the appropriate rates of pay; (2) whether Piece-Rate Subclass members were paid properly for their rest periods; and (3) whether former employees who were laid off at the end of each season are entitled to penalties. Each of these questions should be resolved on class-wide bases. While individual damages might vary, this variation does not render the case unmanageable. *Blackie*, 524 F.2d 891, at 905 ("the amount of damages is invariably an individual question and does not defeat class action treatment"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). .

In this action, the overall practices and policies of Gerawan predominate over any issues regarding potential individualized damages. Plaintiffs' expert was able to determine which of the employees in the sample met the requirements for each of the sub-classes.[108] If given the data for all of the employees, Dr. Petersen would be able to make the same determination for each Class Member.[109] As such, each subclass is governed by a common, predominating policy and the damages are subject to common proof.

## 2. Class Treatment is Superior to Other Available Methods

Superiority is satisfied where the objectives of the particular class action will be achieved in the particular case. *See Hanlon*, 150 F.3d at 1023 (internal citations omitted). The inquiry necessarily involves a comparison of alternative dispute resolution mechanisms. Rule 23(b)(3) lists four non-exclusive factors in determining whether a class action is superior:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

It is unlikely that class members have any interest in individually controlling their own separate actions. Class Members are seasonal agricultural workers and their limited economic resources, lack of English language proficiency, and the severe difficulty of finding experienced counsel in rural areas to handle individual cases would deprive most of the Class of the practical opportunity to pursue their claims. See FRCP 23(b)(3)(A); *see also Carlson,* 166 F.R.D at 479-80; *Leyva,* 125 F.R.D. at 518. Any Class Member who wants to pursue an individual action can opt out. Realistically, most Class Members

---

[108] (Petersen Decl., ¶¶ 10, 13, and 14).
[109] (*Id.* at ¶ 7).

Plaintiff's Notice Of Motion And Motion For Class Certification

*Case No. 1:14-cv-00147-DAD-SAB*

1  will prefer the economies of time, effort, and expense afforded by allowing a class action.   This includes

2  current employees who would forgo their individual actions due to an understandable fear of retaliation,

3  particularly in this economy. *Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715, 745-46 (2004).

4       No other litigation concerning this controversy has been commenced by or against Class Members,

5  even though the claims of Plaintiffs and the Class date back to February 2010.  FRCP 23(b)(3)(B).

6  Moreover, it would be judicially convenient to concentrate litigation in this forum because Gerawan is

7  located and maintains its offices in this district and the records and other evidence pertaining to potential

8  Class Members' employment are located in this district.  FRCP 23(b)(3)(C).

9       Finally, the benefits of maintaining this Action on a class basis appear to outweigh any

10  administrative burdens.  Conducting this case as a class action would be far less burdensome than

11  prosecuting numerous separate actions, which would entail risks of duplicative discovery procedures,

12  disputes among counsel, repeated adjudication of similar controversies, and excessive time and costs.

13  FRCP 23(b)(3)(D).  *See Lerwill*, 582 F.2d at 512.  As explained above, each subclass is governed by a

14  common and predominating policy and the damages are subject to common proof.

15       As such, the Court should certify this case pursuant to Federal Rule of Civil Procedure 23(b)(3).

16  **VI.  CONCLUSION**

17       For the foregoing reasons, the prerequisites of Federal Rule of Civil Procedure 23 (a) and

18  23(b)(2) and/or 23(b)(3) are satisfied, and this Court should certify the proposed sub-classes.

19

20  Dated: December 11, 2015          KINGSLEY & KINGSLEY, APC

21

22            By: /S/ ERIC B. KINSGLEY

23            ERIC B. KINGSLEY

          Attorney for Plaintiff

24

25

26

27

28

25

(PROOF OF SERVICE BY MAIL - 1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county aforesaid, State of California.  I am over the age of eighteen years and not a party to the within entitled action; my business address is 16133 Ventura Boulevard, Suite 1200, Encino, California 91436.

On December 14, 2015, I served the foregoing document described as **NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

BARSAMIAN MOODY
A Professional Corporation
Attorneys at Law
Ronald H. Garsamian
Patrick S. Moody
Manuel E. Ignacio
1141 W. Shaw Avenue, #104
Fresno, CA 93711

[]   BY MAIL:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Encino, California, in the ordinary court of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

XX   BY PERSONAL SERVICE:  I caused such envelope to be hand delivered to the addressee.

☐   BY EMAIL:  A pdf copy of which was sent via email to the above email address(es).

X   FEDERAL  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Michelle A. Tanzer